# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 6365 | **DATE** | 5/11/2000 |
| **CASE TITLE** | State Farm Mutual Automobile Insurance vs. Harold Abrams, Esq., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Legal and Medical Defendants' motions for summary judgment (Doc. 1048-1, 1052-1) are denied. Accordingly, the Defendants' motions to strike portions of State Farm's 12(N) Statement (Docs. 1101-1, 1113-1, 1118-1) are likewise denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

MAY 11 2000
date docketed

5/11/2000
date mailed notice

Document Number

1170

| ETV | courtroom deputy's initials | |
|---|---|---|

Date/time received in central Clerk's Office

ETV
mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois mutual insurance company, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) | No. 96 C 6365 |
| | ) | |
| HAROLD ABRAMS, ESQ., et al., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this case, Plaintiff, an auto insurance carrier, claims that a group of doctors and lawyers conspired to defraud Plaintiff by submitting millions of dollars worth of claims arising from hundreds of nearly identical phony car accidents. Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") filed this lawsuit on its own behalf against twenty-eight Defendants alleging multiple enterprises in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and pendant common law fraud and conspiracy claims. Specifically, State Farm alleges that certain attorneys ("Legal Defendants") and health care providers ("Medical Defendants") (or collectively the "Moving Defendants") conspired to pay street level organizers ("SLO Defendants") to orchestrate automobile accidents. In each of these staged accidents, drivers of older vehicles intentionally slam on their brakes in front of newer and commercial vehicles to deliberately cause rear-end collisions and to manufacture fraudulent property damage and personal injury claims. As a

result of paying these allegedly fraudulent claims, State Farm claims that it has incurred more than $3,000,000 in damages. Eight of the Legal and Medical Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1] For the reasons stated below, the motions are denied.

## BACKGROUND

Although the issues of law are complex, the facts in this case are straightforward. State Farm claims that the SLO Defendants recruited drivers and passengers of older cars to intentionally and suddenly apply the brakes in front of unsuspecting drivers of newer or commercial cars. Their plan, State Farm claims, was to cause rear-end vehicular accidents for the purpose of pursuing fraudulent bodily injury and property damage claims with State Farm. (First Am. Compl. ¶ 1.) According to State Farm, these SLO Defendants would then direct the recruits to particular medical providers who allegedly exaggerated or inflated their medical bills, and to attorneys who pursued bodily injury and property claims. (*Id.* ¶ 35(a).)

State Farm's evidence of the scheme consists primarily of the following: (1) a pattern of activity, summarized in chart form, showing similar types of accidents, occurring in a limited geographic area, involving certain numbers of passengers in certain types of vehicles, involving the Legal and Medical Defendants, and involving the same soft tissue injuries; (2)

---

[1]     The following Legal and Medical Defendants have filed this joint motion for summary judgment: Harold Abrams, Esq.; Harold Abrams, P.C.; Ron Abrams, Esq.; Charles Conner, Jr., Esq.; CMC Investors; Ralph Duran, D.C.; Gertrude Miller; and Miller Medical Management, Inc. Roseanne Chico has also moved for summary judgment. On November 29, 1999, however, the court ordered State Farm's case against Chico severed from this action and terminated Chico's motion for summary judgment (Doc. 1056-1).

State Farm claims files including claimant accounts of the accident and police reports; (3) invocations of the Fifth Amendment privilege against self-incrimination by certain Defendants and other non-party potential witnesses; (4) testimony from former employees of the Legal and Medical Defendants; (5) payments made by the Legal and Medical Defendants to the SLO Defendants; and (6) expert testimony. The Legal and Medical Defendants seek summary judgment, arguing that most of this circumstantial evidence is either inadmissible, or fails to directly implicate any of them. Each Legal and Medical Defendant has disavowed any awareness of or knowing participation in the alleged scheme. (Conner 12(M) ¶¶ 66-69, 81, 75-76; Harold Abrams and Abrams, P.C. 12(M) ¶¶48, 51; Harold Abrams Aff. ¶¶ 13-17; Ron Abrams 12(M) 27, 30; Ron Abrams Aff. ¶¶ 12, 14; Duran and CMC Investors 12(M) 7-11; Duran Aff. ¶¶6-9; Miller 12(M) ¶ 28.) Because State Farm fails to contradict these sworn denials with specific "statements" constituting direct evidence to the contrary, the Moving Defendants argue that judgment should be entered in their favor.

## DISCUSSION

The Legal and Medical Defendants advance a number of arguments in support of their motions. As a threshold matter, the Moving Defendants assert that State Farm, suing on its own behalf and not on behalf of its insureds, lacks standing to bring a RICO claim. The Legal and Medical Defendants argue further that most of State Farm's evidence is inadmissible, and the remaining evidence is insufficient to support State Farm's claims. Even if State Farm's evidence is admissible, the Legal and Medical Defendants argue that State Farm cannot prove certain elements of its RICO claims, its common law fraud claims or its

conspiracy claims. Specifically, with respect to its RICO claims, the Moving Defendants argue that State Farm cannot show that they operated and managed any of the alleged enterprises; that State Farm did not reasonably rely on the alleged misrepresentations; that State Farm cannot prove the predicate act of mail fraud; and that State Farm has no facts supporting its RICO conspiracy claims. The Legal and Medical Defendants also argue that State Farm cannot prove reliance under common law fraud, and that State Farm has no evidence sufficient to support a common law conspiracy claim. The court addresses each argument in turn, and concludes that an issue of material fact remains with respect to each of State Farm's allegations.[2]

## A.    Summary Judgment Standards

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir. 1999). It is the movant's burden to establish the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding whether that burden has been met, the court must examine the evidence and draw all reasonable

---

[2]        Before beginning its discussion, the court notes its disappointment with State Farm's performance in opposing the Moving Defendants' motions, particularly its submission of more than one hundred exhibits to which State Farm almost never cites in its brief. In denying these motions, the court emphasizes that State Farm has not won the lawsuit; indeed, the court struggled with all the issues, finding each to be a close call, even at the summary judgment stage where inferences are drawn and doubts resolved in favor of the non-movant.

inferences in the light most favorable to the nonmoving party. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.), *cert. denied*, 525 U.S. 929 (1998). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carter v. American Oil Co.*, 139 F.3d 1158, 1161 (7th Cir. 1998). For summary judgment purposes, however, a non-movant is not required to offer evidence that conclusively proves the truth of its allegations. *See Marchionna v. Ford Motor Co.*, No. 94 C 275, 1995 WL 476591, at *14 (N.D. Ill. Aug. 10, 1995).

Credibility determinations and assessment of the weight to be afforded evidence are tasks for a jury, not the judge, and are therefore inappropriate on a motion for summary judgment. *See Celex Group, Inc. v. Executive Gallery, Inc.*, 877 F.Supp. 1114, 1124 (N.D. Ill. 1995). Because the burden of establishing intent or knowledge is difficult, summary judgment should be approached carefully in cases involving these issues. *See Scheib v. Grant*, 22 F.3d 149, 155 (7th Cir.) (citations omitted), *cert. denied*, 513 U.S. 929 (1994).

### B.  RICO Standing

Citing the Seventh Circuit's recent decision in *International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999), the Legal and Medical Defendants argue that State Farm lacks RICO standing because its injury is too remote to satisfy the statute's causation element. In *State Farm Mut. Auto Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL 152143, at * 2-3 (N.D. Ill. Feb. 4, 2000) this court concluded that State Farm has alleged suffered an injury direct enough to confer standing under RICO. Briefly summarized, this court reasoned that State Farm met the requisite proximate cause

element because State Farm was the target of the alleged enterprise's goal to defraud insurance companies, and was therefore the direct target of the alleged misrepresentations. Unlike the insurance company plaintiff in *International Bhd. of Teamsters*, "State Farm made payments directly to the Legal and Medical Defendants, the alleged wrongdoers, and not to its insureds." *See State Farm v. Abrams*, 2000 WL 152143, at *2. Further, this court concluded that State Farm, not its insureds, is the party best equipped to "vindicate the law as a private attorney general." *See id.* at *3. Recognizing the difficulty and significance of the issue, however, this court certified the following question for interlocutory appeal:

> Does the doctrine of proximate cause preclude a third-party-payor plaintiff from seeking recovery under RICO of monies paid directly to the alleged wrongdoer for fraudulent insurance claims?

*Id.* at *4. The Seventh Circuit declined interlocutory review of the issue. For the reasons set forth in its earlier opinion, *see id.* at *2-3, the court determines that State Farm has RICO standing.

## C.      Admissibility of Certain Evidence

The Legal and Medical Defendants challenge the admissibility of much of State Farm's evidence. They argue that the statements made by State Farm's insureds in accident reports are hearsay and do not qualify under the business records exception. The Moving Defendants further assert that invocations of the Fifth Amendment privilege against self-incrimination made by third parties cannot be used to draw negative inferences against them.

### 1.      Claims Files

First, the Moving Defendants argue with considerable force that State Farm cannot

6

rely on statements from its insureds in the claim files as evidence that the accidents were intentionally caused pursuant to a conspiracy because those statements constitute inadmissible hearsay. State Farm's response is a bald assertion that these statements fall within the business records exception to the hearsay bar. *See* FED. R. EVID. 803(6).

State Farm's failure to respond more thoughtfully to this and other arguments presented on these motions is disappointing. The insureds' statements, as offered by State Farm, do constitute hearsay: they are unsworn out-of-court statements offered to prove the truth of the matter asserted - e.g., they are offered to prove that the accidents were indeed "sudden stop" accidents. Despite the liberal view the federal courts take on the business record exception to hearsay, *see, e.g., United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995), the court is not convinced that these statements meet the requirements for admissibility under Federal Rule of Evidence 803(6). Although these claim files are prepared in the normal course of business, they were not prepared by one with personal knowledge of the events, nor by an informant having personal knowledge of the events and a business duty to transmit the information to the entrant; nor were they all made at or near the time the events occurred. *See Datamatic Servs., Inc. v. United States*, 909 F.2d 1029 (7th Cir. 1990) ("'[I]f the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception. . .'"). *But see Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1341 (Fed. Cir. 1999) (admitting insurance claims files under business record exception where other circumstances indicated the trustworthiness of the documents); *United States v. Sokolow*, 91 F.3d 396, 403

(3d Cir. 1996) (summary of unpaid insurance claims admissible under business records exception to hearsay rule where entrant had adequate verification or other assurances of the accuracy of the information provided by the outsider), *cert. denied*, 519 U.S. 1116 (1997).

Nevertheless, this issue is not a straightforward one, and the court is reluctant to bar the admission of these statements on summary judgment for two reasons. First, neither party directs the court to an exhibit explicitly containing records of the insureds' statements to State Farm. Presumably because the of the sheer volume of the claims files, the information related by the insureds to State Farm was used to compile the several charts submitted by State Farm and arguably exhibiting a pattern of conduct. (Pl.'s 12(N), Exs. 47, 86, 91, 106.) These charts contain information including the date of the accident, the place of the accident, the way the accident occurred, the number of persons in each vehicle, the model year of the cars involved, and the medical and legal providers involved. The charts reflect that, in each case, the accident was a rear-end collision in which the insured drove a newer vehicle than the vehicle driven by the claimant; frequently, only the insured was in his or her vehicle, while multiple persons were in the claimant vehicle; the accident occurred within a specific geographic area; and one or more of the Legal and Medical Defendants were involved. Second, although the Legal and Medical Defendants argue that these charts do not show a pattern of conduct, they make no evidentiary objections to the chart itself. In making this blanket hearsay objection, the Moving Defendants do not point to which portions of the chart are based on inadmissible hearsay, and which are not.

Because the Legal and Medical Defendants have not adequately objected to the

admission of the insureds' statements, the court overrules this objection. *See Sanders v. International Union of Operating Engineers, Local 150, AFL-CIO*, No. 97 C 5948, 2000 WL 283106, at *4 (N.D. Ill. Mar. 8, 2000) (overruling blanket objection to admissibility of evidence made at summary judgment stage). Further, because some of the information contained in the charts is corroborated by other independent evidence submitted by State Farm, for example, Abrams P.C.'s interview sheets indicate that the claimant cars were older than the insureds' cars (Pl.'s 12(N), Ex. 46), the court will not bar the charts on this motion for summary judgment, but suggests that State Farm adequately prepare itself for motions *in limine* on this issue.

### 2. Fifth Amendment Adverse Inferences

A number of co-Defendants and potential witnesses in this case have invoked their Fifth Amendment privilege against self-incrimination, including: all the SLO Defendants (Pl.'s 12(N), Exs. 20-23); Minerva Wieczorek and Janet Winer, employees of Abrams, P.C. (*Id.*, Exs. 6-7); non-moving medical Defendants Victor Wojtas, David Calimag, and Mark Gerber (*Id.*, Exs. 36-38); and Arthur Brown and Don Brown, non-Defendant SLOs (*Id.*, Exs. 40-41). Types of questions to which these potential witness variously refused to respond include questions pertaining to the Moving Defendants' involvement in the operation and management of the Carter Enterprise (Pl.'s 12(N) ¶¶ (A)38, (A)39, (B)41, (D)56, (F)25); the Moving Defendant's knowledge of the staged accidents (*Id.* ¶¶ (A)49, (A)50, (A)51, (B)27, (B)28, (D)61, (E)7, (F)17); the Moving Defendants' knowledge of the falsity of the medical claims (*Id.* ¶¶ (A)53, (B)27, (B)50, (D)70, (E)8); and the Moving Defendants' agreement to

participate in or facilitate the alleged conspiracies (*Id.* ¶¶ (A)58, (A)62, (A)63, (B)55, (D)77 (F)25).

The Moving Defendants raise several objections to State Farm's reliance on Fifth Amendment invocations by other witnesses and non-parties. They contend, first, that these Fifth Amendment assertions, standing alone, are insufficient to defeat summary judgment. Further, the Legal and Medical Defendants contend that besides failing to establish an evidentiary basis to justify an adverse inference against the person invoking the Fifth Amendment, State Farm cannot demonstrate that these invocations made by other Defendants and non-parties should be imputed to the Legal and Medical Defendants.

It is well established that an adverse inference may be drawn against a party to a civil action who refuses to testify under the privilege of the Fifth Amendment. *See Baxter v. Palmigiano*, 425 U.S. 308, 320 (1976). Nevertheless, an adverse inference drawn against a party invoking the Fifth Amendment privilege is ordinarily insufficient to support summary judgment in the absence of other independent, material and probative evidence. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) ("[T]he entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds.") (quoting *Baxter*, 425 U.S. at 318); *Centennial Life Ins. Co., v. Nappi*, 956 F.Supp. 222, 228 (N.D.N.Y. 1997) ("An adverse inference against the party invoking the Fifth Amendment by itself is insufficient to establish the absence of a genuine issue of material fact."). Nor is an adverse inference based on a Fifth Amendment invocation alone sufficient evidence to defeat summary judgment. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d

661, 675 (5th Cir. 1999) ("[T]he adverse inference from a party's refusal to answer questions was not enough to create an issue of fact to avoid summary judgment."); *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) ("The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production."), *cert. denied*, 502 U.S. 1048 (1992).

State Farm responds to this line of authority by arguing that it has submitted other evidence in addition to the Fifth Amendment invocations. The Legal and Medical Defendants assert the contrary; they argue that State Farm's evidence - e.g., the claims files, the pattern and the evidence of payments to the SLO Defendants - is nothing more than "innuendo, conjecture and speculation." (Defs' Mot. for Summ. J., at 2.)

Had the Legal and Medical Defendants themselves invoked the Fifth Amendment privilege against self-incrimination, the court would not hesitate to conclude that a fact-finder may draw reasonable adverse inferences from the invocation. As will be discussed later, State Farm has produced sufficient evidence to show the existence of a genuine issue of material fact. The problem here is that State Farm urges this court to draw adverse inferences against the Legal and Medical Defendants based on the Fifth Amendment invocations of the SLO Defendants, and certain other Medical Defendants.[3]

In order to impute a third-party's Fifth Amendment invocation to another party, the party seeking to use the invocation must establish some relationship of loyalty between the

---

[3] Drs. Gerber, Calimag and Wojtas all invoked their Fifth Amendment right against self-incrimination. (Defs.'s 12(N), Exs. 36-38.)

other two parties. *See LiButti v. United States*, 107 F.3d 110, 122 (2d Cir. 1997). Courts that have addressed this issue have rejected bright-line rules, and instead have concluded that the party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference. *See LiButti*, 107 F.3d at 121; *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co.*, 45 F.3d 969, 978 (5th Cir. 1995); *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 277 (3d Cir. 1986); *Cerro Gordo Charity v. Fireman's Fund Amer. Life Ins. Co.*, 819 F.2d 1471, 1481 (8th Cir. 1987); *United States v. District Council of New York City*, 832 F.Supp. 644, 651-52 (S.D.N.Y. 1993). The *LiButti* court suggested four "non-exclusive" factors to guide courts in making these determinations: (1) the nature of the relationships at issue ("The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship."); (2) the degree of control the party has over the non-party witness; (3) the compatibility of the interests of the party and non-party witnesses in the outcome of the litigation; and (4) the role of the invoker in the litigation. *See LiButti*, 107 F.3d at 123-24. The "overarching concern" in assessing the propriety of drawing a negative inference from assertion of the Fifth Amendment privilege by a non-party is "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *See id.* at 124 (citations omitted).

Most of the courts that have imputed adverse Fifth Amendment inferences from one party to another have done so where there is a close family or business relationship between the person who exercised the Fifth Amendment right and the individual against whom an

adverse inference is drawn. *See, e.g., LiButti*, 107 F.3d at 124 (father/daughter); *Brink's, Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (employer/employee); *RAD Services*, 808 F.2d at 278 (employer/employee); *Cerro Gordo*, 819 F.2d at 1481-82 (charitable organization/former director of organization). Relying on these cases, one court has held that at least in principle, "the refusal to testify by a proven co-conspirator may justify an adverse inference against other conspirators." *See United States v. District Council of New York City*, 832 F.Supp. at 652. The court reasoned that because co-conspirators are generally regarded as agents for each other, the rationale that justifies imputing Fifth Amendment invocations based on family or employment relationships is also applicable in a conspiracy relationship. *See id.* In so deciding, the court cautioned, however, that the nature of the relationship should dictate the fairness for imputing an adverse inference. *See id.* Ultimately, on a motion in limine where the defendant objected to the admission of Fifth Amendment invocations of alleged co-conspirators, the court refused to bar the admission of the invocations, noting that "[w]hether the proof at trial will support the inference remains to be seen." *See id.* In the same case, on an earlier motion for summary judgment, the court concluded that it need not determine the admissibility of non-party Fifth Amendment invocations because such evidence was not essential to the non-movant's ability to survive the motion. *See United States v. District Council of New York City*, No. 90 C 5722, 1993 WL 159959, *5 (S.D.N.Y. May 12, 1993).

The court agrees with the New York District Court that under appropriate circumstances, an adverse inference could be drawn against a party from an alleged co-

conspirator's invocation of the Fifth Amendment privilege against self-incrimination. Applying the factors listed in *LiButti*, the court believes that this case may well present appropriate justification for imputing the Fifth Amendment invocations of the alleged co–conspirator non-moving Medical and SLO Defendants to the Legal and Medical Defendants. As alleged co-conspirators, some degree of loyalty and/or control may prevent one party from rendering damaging testimony against another. Furthermore, the interests in the outcome of the litigation of the invoking SLO and non-moving medical Defendants align directly with the interests of the Moving Defendants: all have been accused of fraudulent conduct. In fact, SLO Defendants and the Abrams, P.C. employees present particularly appropriate persons to consider in drawing adverse inferences against the Moving Defendants. These Defendants presumably have intimate knowledge of the workings of the Carter Enterprise and of the Abrams Enterprise. Finally, all of the invoking Defendants have a significant role in the litigation: they are parties to the suit. These factors weigh in favor of allowing adverse inferences to be imputed to the Legal and Medical Defendants.

The court recognizes that the persons who invoked the Fifth Amendment would have substantial individual motivations for doing so. Drawing an adverse inference against these Moving Defendants may yet be appropriate if the jury finds clear and convincing evidence of the existence of a conspiracy, as required to prove a common law conspiracy claim in Illinois, involving each of the Defendants alleged to have participated in the scheme. As discussed *infra*, the court concludes that State Farm has offered enough evidence to create a dispute of material fact concerning the existence of a conspiracy. Nevertheless, because the

14

court can decide this summary judgment motion without relying on Fifth Amendment adverse inferences, the court saves the issue of the admissibility of these invocations for another day.

### D.    RICO Section 1962(c) Liability[4]

State Farm alleges that the Legal and Medical Defendants violated RICO statutes by conducting an enterprise through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c). Specifically, State Farm names the Carter Enterprise,[5] claiming that it is comprised of and directed by the four SLO Defendants whose purpose has been to enrich themselves by "systematically and deliberately victimizing unsuspecting drivers and by pursuing fraudulent

---

[4]    Neither the movants nor the non-movants have been particularly effective in presenting evidence in this summary judgment motion. Although both sides have submitted extensive statements of undisputed material facts, neither side has adequately cited to the evidence that supports these statements. First, the movants submitted a combined brief in support of their motion, but fail to address the evidence as to each of the Defendants joining the motion, instead focusing primarily on the Abrams Defendants and Defendant Conner. Defendants CMC and Duran submitted a "Supplemental Brief" consisting of only three pages of argument, and adding nothing to the motion in terms of evidence or argument. In response, State Farm's brief opposing the motion is almost devoid of citations to its own 12(N) Statement, and responds to the Moving Defendants' "lumped" arguments with arguments often similarly lumping the Moving Defendants together. To the extent the court has been able to sort out evidence as it applies to the individual or corporate Moving Defendants it has done so; nevertheless the court lumps conclusions about the parties' arguments and evidence together where the parties' efforts render the court unable to address them separately. Although it has done so to some extent, the court notes it is under no obligation to "scour" the entire record looking for factual disputes. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

[5]    The Carter Enterprise allegedly consists of the following SLO Defendants who allegedly organized the sudden stop accidents: Darius Carter, Lawrence Carter, Bernard Johnson and Van Watts. (First Am. Compl. ¶ 40.) Presumably, the "Carter Enterprise" derives its name from the Carter brothers who allegedly operated the scheme.

personal injury and property damages claims relating to the Sudden Stop Accidents." (First Am. Compl., Count One ¶¶ 40, 43; Rico Case Statement ("RCS"), at 65.) State Farm does not include the Legal and Medical Defendants as members of this alleged enterprise. (First Am. Compl. ¶ 40; RCS, at 68 ("The defendant attorneys, health care providers and related parties are separate from the enterprise[.]").) Nevertheless, State Farm alleges that the Legal and Medical Defendants knowingly "conducted and/or participated, directly and indirectly, in the affairs of the Carter [Enterprise.]" (First Am. Compl. ¶ 44.) State Farm also alleges that each legal and medical office constitutes an individual RICO enterprise, operating for the purpose of defrauding insurance companies through the alleged conduct. (First Am. Compl., Counts Five, Seven, Nine, Thirteen, and Fifteen.)

RICO Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which, affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In order to maintain a claim under this Section, a plaintiff must show the following elements by a preponderance of the evidence: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998). The Legal and Medical Defendants argue that they are entitled to summary judgment on the RICO claims, first, because State Farm has not shown that they operated or managed the Carter Enterprise, and second,

because State Farm cannot prove that the Legal and Medical Defendants have committed the predicate act of mail fraud.

## 1. "Conduct" Element

The Legal and Medical Defendants argue that as "outsiders" or non-members of the Carter Enterprise, they are entitled to summary judgment because State Farm has no evidence that they "operated" or "managed" the Carter Enterprise as required by *Reves v. Ernst & Young*, 507 U.S. 170 (1993). Without evidence that the Legal and Medical Defendants directed the affairs of the Carter Enterprise, they cannot be found liable for a subsection (c) violation. Likewise, they contend that activity alleged in the individual enterprises, which by incorporation include the SLO Defendants, cannot be imposed on the Moving Defendants because State Farm has no evidence that these Defendants directed the alleged scheme.

In *Reves*, the United States Supreme Court held that a defendant may only be found civilly liable under Section 1962(c) if he or she participated in either the management or operation of the alleged enterprise; that is, that the defendant played "some part in directing [the enterprise's] affairs." *See Reves*, 507 U.S. at 179, 183. In so holding, however, the Supreme Court refused to limit Section 1962(c)'s reach to upper-level managers of the enterprise, explaining that lower rung participants who take direction from enterprise managers may be liable for participation in the operation of the enterprise. *See id.* at 184. The Supreme Court went on to say that even "outsiders" may be found liable under Section 1962(c) if they are "associated with" the enterprise and participated in its operation or management. *See id.* at 185. The Court suggested that although mere participation in the

17

activities of the enterprise is not enough, an outsider who exerted sufficient control over the enterprise, for example, through bribery, could be said to operate or manage the enterprise. *See id.* at 184; *Goren*, 156 F.3d at 727.

State Farm argues that although the Legal and Medical Defendants are outsiders to the Carter Enterprise, they are subject to RICO liability because they participated in its "core activities" and exercised financial control over the enterprise. For their part, the Legal and Medical Defendants insist that State Farm has offered no evidence that they did anything other than provide ordinary legal or medical services.

Since the issuance of the *Reves* decision, lower courts have struggled to define the amount of control an outsider must exert over an enterprise in order to be liable under Section 1962(c). While "lower rung participants" will be liable under Section 1962(c) for merely "enabling the enterprise to meet its goals," outsiders will not be liable unless they take some part in directing the enterprise's affairs, even if the outsiders knowingly furthered the enterprise's goals. *Compare MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 969 (7th Cir. 1995) (plaintiff stated a Section 1962(c) claim by alleging that defendants who knowingly implemented management's decisions enabled the enterprise to achieve its goals) *with Resolution Trust Corp. v. S & K Chevrolet Co.*, 918 F.Supp. 1235, 1248 (C.D. Ill. 1996) (allegations that defendant "'materially affected the direction of the enterprise by enabling and encouraging S&K employees and officers to carry out their fraudulent schemes'" were insufficient to state a claim against outsider who merely provided professional services to the enterprise), *vacated in part on other grounds*, 923 F.Supp. 135 (C.D. Ill. 1996). Most courts

have, however, held that the mere provision of professional services by outsiders, even with the knowledge of the illicit nature of the alleged scheme, does not rise to the level of operation or management of the enterprise as required by *Reves*. *See, e.g., Goren*, 156 F.3d at 727-28; *Webster v. Onmitrition Int'l, Inc.*, 79 F.3d 776, 789 (9th Cir. 1996) (despite ministerial role as officer for the enterprise-corporation, attorney's statements allegedly promoting RICO scheme did not constitute participation in the operation or management of the enterprise); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521-22 (2d Cir. 1994) (attorney who had no role in the conception, creation, or execution of the purported scheme not liable under RICO for merely providing legal services to enterprise); *Baumer v. Pachl*, 8 F.3d 1341, 1344-45 (9th Cir. 1993) (attorney who simply provided legal services to enterprise-corporation did not participate in the management or operation of enterprise regardless of whether he performed those services "well or poorly, properly or improperly"); *University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result."); *Biofeedtrac, Inc. v. Kolinar Optical Enterprises & Consultants, S.R.L.*, 832 F.Supp. 585, 591 (E.D.N.Y. 1993) (even though attorney may have intentionally facilitated clients' scheme to defraud plaintiff, without evidence that attorney participated in operation or management of RICO enterprise, attorney could not be liable).

Relying on this line of cases, the Legal and Medical Defendants argue that they are entitled to summary judgment because State Farm has not produced any evidence showing that they did anything other than provide professional services. State Farm, in response,

points to a number of court decisions finding that attorneys and other professionals who have gone beyond the provision of professional services and have participated in the management or operation of a RICO enterprise could be liable under Section 1962(c). *See, e.g., Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) (denying alleged insider attorney's motion for summary judgment and noting that "[b]ehavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise" by creating false documents, concealing material information and litigating what the attorney knows to be fraudulent claims)[6]; *Napoli v. United States*, 32 F.3d 31, 36 (2d Cir. 1994) ("of counsel" attorneys operated and managed a law firm enterprise where they participated in the "core activities" of the firm through bribing and coaching witnesses to testify falsely and litigating cases), *cert. denied*, 513 U.S. 1110 (1995); *Fortney v. Kuipers*, No. 98 C 5387, 1999 WL 102772, at *10 (N.D. Ill. Feb. 22, 1999) (allegation that attorney participated in operation and management of enterprise by performing legal services to transfer assets knowing that client's intent was to conceal assets from plaintiff sufficient to state Section 1962(c) claim).

In *Tribune Co. v. Purcigliotti*, 869 F.Supp. 1076, 1098 (S.D.N.Y. 1994), a case factually similar to this lawsuit, the court held that allegations that an attorney and a physician

---

[6]     Although the court recognizes that this case is factually distinguishable from the present case because the plaintiff in *Handeen* alleged that the attorney was a member of the RICO enterprise, it is cited here to show that attorneys are not exempt from RICO liability merely because of their professional status.

knowingly substantiated and pursued fraudulent workers compensation claims were sufficient to state a Section 1962(c) claim. In *Purcigliotti*, unionized workers, embittered by a previous strike, allegedly formed an enterprise for the purpose of defrauding the Tribune Company by filing and prosecuting false workers' compensation claims based on claimed hearing loss. *See id.* at 1082. Plaintiff Tribune alleged that in order to implement the fraudulent scheme, the workers retained attorney Purcigliotti to pursue the claims and that Purcigliotti directed the workers to a physician who knowingly performed inaccurate hearing loss tests to support the claims. *See id.* With respect to the legal outsider defendants, the complaint alleged facts similar to those alleged here: that nearly every claim contained identical allegations; in some cases, the law firm prepared the claims without input from the claimants; and the claimants learned of the need to falsify responses to the hearing loss tests as a result of discussions with their lawyer. *See id.* at 1098. With respect to the medical outsider defendant, again the allegations are similar: the medical defendants allegedly performed the hearing loss tests, took no steps to ensure their accuracy, falsely certified the audiograms, and sent the test results to the union. *See id.* at 1097. Based on these allegations, the court found that Tribune had adequately pleaded a claim that the legal and medical outsider defendants participated in the operation or management of the enterprises. *See id.* at 1097, 1098. Although the *Purcigliotti* court was deciding a motion to dismiss, the decision is instructive in detailing what sort of evidence might sustain allegations that an outsider providing professional services to an enterprise might reasonably lead to the inference that such outsiders had some part in directing the affairs of the enterprise.

The court concludes, from the cases cited both sides here, that an attorney or medical provider cannot be liable under RICO, even with knowledge of the illicit nature of the alleged enterprise, merely for providing professional services. An attorney or physician is not exempt from RICO liability, however, simply by virtue of the attorney's or physician's professional status. These cases likewise indicate that if a doctor or lawyer provides services that go to the heart of the allegedly fraudulent scheme, the professional may be liable for providing some direction in the affairs of the enterprise. Here, the Carter Enterprise's alleged purpose is the manufacture and pursuit of fraudulent insurance claims. As described more fully below, the court concludes that State Farm has submitted enough evidence to at least create a genuine issue of material fact as to the extent that the Legal and Medical Defendants participated in the alleged enterprise.

### a. Direction of Carter Enterprise Affairs

First, accompanying its First Amended Complaint, State Farm submitted to the court charts of activity summarizing dozens of accidents, occurring in a limited geographic area, involving certain numbers of passengers in certain types of cars, involving the Legal and Medical Defendants, and involving the same soft tissue injuries. The sheer number of similar accidents involving each Moving Defendant (130 accidents involving the services of the Abrams Defendants; 135 accidents involving the services of Defendant Conner; 190 accidents involving the services of the Miller Defendants; 44 accidents involving the services of Defendants CMC and Duran) could give rise to a reasonable inference that the Moving Defendants were not just providing professional services but may have had some role in

directing the affairs of the enterprise. Although Defendant Conner argues that these charts do not tend to show any sort of pattern of activity and submitted his own chart purporting to analyze the same accidents, whether Conner's or State Farm's version of the facts is more accurate is a question for the jury.

At least some other evidence bolsters the conclusion that these charts establish a pattern that suggests the Legal Defendants participated in the operation or management of the alleged enterprise. For example, claimants represented by the Abrams office and the Conner office have testified that their attorney directed them to certain medical providers for treatment, often as late as two to three weeks after the accident. (Pl.'s 12(N), Deposition of Andrew Anderson, a client of Abrams, P.C., Ex 14, at 13, 15, 34; Deposition of Bettye Hudson, a Conner client, Ex. 87, at 14, 34.) Indeed, one of Conner's clients testified that her attorney told her that the amount of money she would receive in settlement would depend on the number of visits she made to Miller Medical Center, and further directed her to visit Miller "at least four times a week." (Pl.'s 12(N), Hudson Dep., at 34.) A former employee of Abrams, P.C. also testified that "Harold would send [claimants] to a doctor to have them looked over." (Pl.'s 12(N), Deposition of Roxanne Samora, Ex. 12, at 31.) Another former employee of Abrams, P.C. testified that after she interviewed clients "they would get assigned a doctor and while they were in the office I would call and make an appointment for them." (Pl.'s 12(N), Deposition of Angelica Zambrano, Ex. 13, at 39.) Although there is nothing per se illegal about an attorney providing a medical referral to his client, this evidence at least raises a genuine issue of material fact as to whether the Legal Defendants directed the affairs

of the enterprise by directing uninjured claimants to medical providers and suggesting that they will recover more if they seek more extensive treatment.

More importantly, State Farm has produced evidence suggesting that the Abrams Office prepared and pursued claims, in at least some instances, without any input from the claimants at all. (Pl.'s 12(N), Deposition of Sabrina Huff Young, client of Abrams, P.C., Ex. 29, at 35-40.) Ms. Young testified that while she sat in a restaurant, a car traveling on Western Avenue hit her parked car. (*Id.*, at 26.) On the scene, Ms. Young testified that "a Black man came to talk to me . . . he said we could get some good money, that he had a lawyer that he could take us to." (*Id.* at 28-29.) She further testified that this man drove her to the Abrams, P.C. office, where the "Black man" told the receptionist that she was in a car accident and that "[s]he just started writing." (*Id.*, at 35.) Ms. Young testified that after that, the receptionist told her she would have to go to a clinic, and could not miss any appointment. (*Id.*, at 36.) Ms. Young was not in the car when it was hit, provided no information to the Abrams, P.C. employee, and yet, based on the "Black man's" story, the claim was pursued, the client was referred for medical treatment, and the client received a cash settlement. From this evidence, a jury could reasonably infer that the Legal Defendants' pursuit of claims involving identical allegations and injuries, without even meeting with the claimant, with all the other evidence presented could result in the conclusion that the Legal Defendants had some part in directing the affairs of the Carter Enterprise.

With respect to the Medical Defendants, State Farm has also produced enough evidence to send the issue of management and control to a jury. Along with the pattern of

activity showing that the Miller Defendants and Duran and CMC were involved in treating many patients involved in sudden stop accidents for identical injuries, often referred by the SLO Defendants or the Legal Defendants, State Farm has also provided evidence that the Medical Defendants directed patients to falsify treatment documentation. Alma Bowman, a sudden stop claimant treated by Duran, testified that she was directed by personnel at CMC to sign in for treatment on days that she had not actually visited the office. (Pl.'s 12(N), Deposition of Alma Bowman, Ex. 48, at 56-57.) Dr. Deck, a physician for Miller Medical Services, testified that Defendant Gertrude Miller suggested to her that all sudden stop accident patients were to receive physical therapy regardless of whether they needed such therapy. Indeed, Dr. Deck testified that although none of the patients she examined at Miller Medical required physical therapy, and she never prescribed such therapy, all of them, including sudden stop accident claimants, received this therapy at Miller Medical. (Pl.'s 12(N), Deck Dep., Ex. 99, at 14-15, 44-45.) A reasonable jury could infer that by providing unnecessary medical services and by suggesting that patients document the receipt of treatment when they did not even visit the clinic, the Medical Defendants had some part in directing the affairs of the Carter Enterprise, part of whose purpose was to pursue fraudulent bodily injury claims.

### b.    Financial Control Over the Carter Enterprise

Beyond this evidence, State Farm has also produced evidence from which a reasonable jury could infer that the Legal and Medical Defendants exerted some level of financial control over the Carter Enterprise. The parties do not dispute that the Legal and Medical Defendants

have paid substantial sums to the SLO Defendants. (Pl.'s 12(N), Ex. 18, summary of checks paid by each Defendant to SLO Defendants.) State Farm relies on these payments as indicia of control over the management and operation of the Carter Enterprise, arguing that these payments were made only for improper referrals.[7]

The Legal and Medical Defendants deny any fraudulent purpose for the payments. Indeed, while Harold Abrams admits that he improperly paid the SLO Defendants for the referral of clients in violation of the Rules of Professional Responsibility (Pl.'s 12(N), Ex. 24, ARDC Disciplinary Petition ¶ 2), Legal Defendants Ron Abrams and Charles Conner insist that such payments were made for investigative services provided by the SLO Defendants, such as taking photographs of the accident scene and taking statements from witnesses. (Pl.'s 12(N), Ex. 59, Conner Dep., at 104-06; Ron Abrams Dep., Ex. 2, at 711-12.) In addition,

---

[7]     Relying on the language in *Reves* that provides bribery as an example of how an outsider may exert control over an alleged enterprise, State Farm attempts to now argue that the Legal and Medical Defendants effectively "bribed" the SLO Defendants to provide referrals. As discussed above, the court accepts State Farm's argument that the payments to the SLO Defendants may be indicia of control over the Carter Enterprise. To the extent State Farm attempts to lodge new allegations of bribery against the Legal and Medical Defendants, however, the court finds such allegations untimely. *See St. Paul Mercury Ins. Co. v. Williamson*, 986 F.Supp. 409, 420 (W.D. La. 1997) ("Because counterdefendants were not 'on notice of the [bribery] issue,' the Court will not consider the allegation of bribery raised for the first time in counterplaintiff's Consolidated Opposition Brief.") (alteration in original). In any event, a violation of Illinois' commercial bribery statute could not trigger RICO liability because a state offense constituting "racketeering activity" under 18 U.S.C. § 1961(1)(A) must be punishable by a sentence of at least one year, and the Illinois statute imposes punishment of a fine not exceeding $5,000. *See Perino v. Mercury Fin. Co. of Ill.*, 912 F.Supp. 313, 319 (N.D. Ill. 1995) (citing 720 ILCS 5/29A-3). Furthermore, bribery of a public official or witness, 18 U.S.C. §201, or commercial sports bribery, 18 U.S.C. § 224, are the only federal bribery offenses that may constitute "racketeering activity." *See* 18 U.S.C. § 1961(1)(B).

several witnesses have testified that payments from the Legal and Medical Defendants to the Carter Group Enterprise were made solely for the referral of clients or patients.[8] (Pl.'s 12(N), Dep. of Angelica Zamora, former employee of Abrams, P.C., Ex. 13, at 48; Dep. of Barb Mertl, former employee of Abrams, P.C., Ex. 5, at 47-50; Aff. of Marybeth Linse-Zurio, a co-Defendant medical provider, ¶ 10; Dep. of Stephen Bourke, attorney at Conner's office, Ex. 62, at 96-99; Dep. of Darrell Hull, a sudden stop accident participant informed of the particulars of the sudden stop accident ring, Ex. 84, at 31-32, 35.)

Relying on *DeWit v. Firstar Corp.*, 879 F.Supp. 947 (N.D. Iowa 1995), the Moving Defendants contend that the payment of referral fees is not equivalent to participation in the management of an enterprise. *DeWit* involved a cattle investment scheme which the plaintiffs alleged constituted a RICO enterprise. *See DeWit*, 879 F.Supp. at 957-57. Plaintiffs in *DeWit* charged the "outsider" defendants, Firstar Corporation, its affiliate banks, and the banks' officers, with participating in the operation and direction of the cattle investment enterprise, in several ways, including promoting the financial soundness of the investment scheme through the payment of finders' fees for qualified investors. *See id.* at 958. The court dismissed the RICO claim against the "outsider" banks because the plaintiff had failed to allege that the banks had done anything other than provide banking services to the alleged enterprise. *See id.* at 966.

---

[8]    Although it is improper for a lawyer to pay referral fees, see ILL. S. CT. RULES OF PROFESSIONAL CONDUCT 7.2(b), neither party has briefed the court on whether a similar rule governs the practice of medicine.

Although the *DeWit* court dismissed a substantive RICO claim, it cannot be read as establishing that the payment of fees by an outsider as a way of promoting an alleged enterprise is never sufficient to show that the outsider participated in the operation or management of the enterprise's affairs. Standing alone, the payment of referral fees, even if professionally or ethically improper, may not be sufficient evidence to show an outsider's participation in the management or control of a RICO enterprise. Here, however, the payment of referral fees combined with the pattern evidence discussed previously is sufficient to at least raise a genuine issue of fact with respect to the Moving Defendants' RICO liability. A reasonable jury could infer that if the Legal and Medical Defendants were not willing to pay referral fees and then to substantiate and pursue fraudulent insurance claims, the Carter Enterprise would not have recruited so many persons to participate in dozens of nearly identical collisions. Likewise, a jury could infer that the Legal and Medical Defendants would not be willing to pay the substantial referral fees and to pursue claims on a contingent fee basis unless they knew that the claims would be successful. The payments to the SLO Defendants for referrals further supports the conclusion that there is a dispute of material fact as to whether the Legal and Medical Defendants had some part in directing the Carter Enterprise's affairs.

### c.   The Individual Enterprises

In its First Amended Complaint, State Farm also alleges the existence of individual enterprises consisting of the various legal and medical offices, including the attorneys and providers working at each office and certain SLO Defendants. (First Am. Compl., Counts

Five, Nine, Thirteen, and Fifteen.) State Farm alleges that the purpose of each individual provider's enterprise is to defraud insurance companies by "victimizing unsuspecting drivers and by pursuing personal injury and property damage claims relating to the Sudden Stop Accidents." (First Am. Compl. ¶¶ 70, 102, 134, 150.)

The Moving Defendants assert that because the individual enterprise allegations include the SLO Defendants, the *Reves* decision requires that State Farm "demonstrate that each individual defendant managed and controlled the street level organizers (including the Carter Group Enterprise) as well as its own office." This proof is simply not required by *Reves*. *Reves* holds that, to be liable under Section 1962(c), a defendant must play some part in directing the enterprise's affairs; it does not require a showing that the defendant controls all aspects of the alleged enterprise. As outlined above, State Farm has submitted evidence from which a jury could reasonably infer that the Legal and Medical Defendants had some part in directing the pursuit of fraudulent bodily injury and property damage claims: all the Moving Defendants paid the SLO Defendants for referrals; the Legal Defendants directed the claimants to certain medical providers; and the Medical Defendants prescribed and provided unnecessary treatment. Because the alleged purpose of the individual enterprises is identical to the alleged purpose of the Carter Enterprise, this same evidence may show that the Legal and Medical Defendants had some role in directing the affairs of the individual enterprises.

By showing that each of the Legal and Medical Defendants participated in the operation and management of his or her own respective law office or medical office, State Farm has further supported its contention that an issue of fact exists with respect to RICO

liability. As owner/operators, there is no question but that Harold Abrams (Harold Abrams' 12(M) ¶ 5), Charles Conner (Conner's 12(M) ¶ 8), Gertrude Miller (Miller's 12(M) ¶ 1), and Ralph Duran (Duran's 12(M) ¶ 2) participated in the management or operation of their respective offices. Although Ron Abrams denies any management responsibility in Abrams, P.C., other evidence supports an inference that Ron has increasingly become responsible for the operation of his father's law firm. For example, in correspondence dated July 11, 1997, counsel for Harold Abrams and Abrams, P.C. described Ron Abrams as the "manager" of Harold Abrams, P.C. (Pl.'s 12(N), Ex. 3.) Moreover, current and former employees of Abrams, P.C. have testified that Ron had managerial authority and responsibilities including training employees, negotiating claims, meeting clients, writing checks and handling the majority of the firm's caseload. (Pl.'s 12(N), Andrew Greenwald Dep., Ex. 4, at 37-45, 52-53, 61, 107-09, 113, Barb Mertl Dep., Ex. 5, at 99-100.) In conclusion, State Farm has shown the existence of a dispute of material fact with respect to the Legal and Medical Defendants' role in the direction of the alleged individual enterprises.

### 2. "Racketeering Activity" Element

As part of its RICO claim, State Farm must also show that the Legal and Medical Defendants engaged in a pattern of "racketeering activity." RICO defines "racketeering activity" or "predicate acts" as including any act which is indictable under any one of a number of federal statutory offenses, including mail fraud under 18 U.S.C. § 1341. *See* 18 U.S.C. § 1961(1)(B); *see also American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999). State Farm alleges that the Moving Defendants engaged in a pattern of

mail fraud in violation of 18 U.S.C. § 1341. The Moving Defendants argue that they are entitled to summary judgment, however, because State Farm cannot overcome their good faith defense to the allegations of mail fraud.

To prove mail fraud, State Farm must show that the Moving Defendants acted with a specific intent to defraud, and used the mails to further their fraudulent scheme. *See United States v. Ashman*, 979 F.2d 469, 480 (7th Cir.), *cert. denied*, 510 U.S. 814 (1993); *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir. 1992). Good faith, or the absence of bad intent, is a complete defense to mail fraud. *See id.* Successfully asserting the good faith defense does not require the mailed items to be true; instead the defense requires "a genuine belief that the information being sent or given is true." *See Dunn*, 961 F.2d at 650 (quoting *United States v. Preston*, 634 F.2d 1285, 1294 (10th Cir. 1980), *cert. denied*, 455 U.S. 1002 (1982)).

Due to the difficulty involved in establishing a subjective state of mind, cases involving intent are usually not appropriate for summary judgment. *See National Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 267 (7th Cir. 1996). In fact, "[i]f improper motive could reasonably be inferred from facts before the court, sworn denials of such intentions do not remove the issue from the case so as to entitle the party to judgment." *See Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974). This is precisely the situation facing the court here. All of the Moving Defendants have denied any knowledge of the fraudulent nature of the accidents and have disavowed any intent to defraud State Farm. Essentially, the Moving Defendants argue that because State Farm has provided no direct testimony or statement expressly contradicting these denials, State Farm has failed to produce a genuine

issue of fact on the issue of intent.

As previously discussed, however, State Farm has produced evidence from which a rational trier of fact could infer not only participation in the operation and management of the alleged enterprises, but also intent to defraud State Farm. For example, there is evidence that each of the Moving Defendants paid referral fees to the SLO Defendants, possibly evidencing their knowledge that the accidents were manufactured. Moreover, the identical circumstances of all the accidents as well as the claimed injuries should have been apparent to the Moving Defendants, and arguably creates a basis from which a fact finder could infer that they knew or should have known the accidents were staged, and yet they turned the other way and ignored these circumstances. Further, some witnesses have testified that the Medical Defendants prescribed unnecessary treatment and documented treatment services that were never provided. Finally, other witnesses testified that the Legal Defendants referred claimants to medical providers, even when the claimants had not suggested they were injured in the accidents. As such, the Moving Defendants' sworn denials do not "remove the issue [of the intent to defraud State Farm] from the case so as to entitle the party to judgment." *See Conrad*, 494 F.2d at 918. At a minimum, this evidence establishes the existence of a material issue of fact on the issue of intent to defraud.

### E.     Reasonable Reliance

The Moving Defendants also argue that they are entitled to judgment as a matter of law on all the RICO counts and on the common law fraud counts because State Farm cannot show that it justifiably relied on the misrepresentations made in the insurance claims.

Specifically, the Moving Defendants assert that State Farm knew of the alleged fraudulent scheme as early as December 10, 1993, but continued to pay out on these allegedly false claims after that date. State Farm counters that there is at least a material issue of fact about when State Farm became aware of the scheme.

### 1. Reliance Requirement Under RICO

The Moving Defendants contend that because State Farm's RICO claims are based on the predicate act of mail fraud which includes a reliance element, State Farm must demonstrate that it relied on their misrepresentation to support the RICO claims. State Farm concedes that other federal circuit courts have held that in a civil RICO case resting on mail fraud, a plaintiff must establish justifiable reliance. According to State Farm, the Seventh Circuit has instead suggested that the ultimate success of the mail fraud is not a necessary prerequisite to a successful mail fraud claim, and therefore need not be shown here.

This court agrees with the Moving Defendants on this issue. Under at least two theories, State Farm is required to ultimately prove that it justifiably relied on the alleged misrepresentations in order to support its RICO claims. With respect to criminal RICO charges based on mail fraud, the Seventh Circuit has held that the prosecution need not prove that the intended victims of the fraud relied on the misrepresentation. *See, e.g., United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991) ("Those who are gullible, as well as those who are skeptical, are entitled to the protection of the mail fraud statute."). Some lower courts in the circuit have transferred this holding to mail fraud claims brought within the civil context. *See, e.g. Cannon v. Nationwide Acceptance Corp.*, No. 96 C 1136, 1997 WL 779086,

at *7 (N.D. Ill. Dec. 12, 1997) (citing Seventh Circuit criminal case for the proposition that "detrimental reliance by the victim is not necessary to prove a mail fraud violation[.]"); *Perlman v. Zell*, 938 F.Supp. 1327, 1344 (N.D. Ill. 1996) (citing Seventh Circuit criminal case for proposition that "there is [no] requirement that the scheme must have actually fooled [the plaintiff] in order to be actionable as mail fraud."), *aff'd* 185 F.3d 850 (7th Cir. 1999).

This court believes, however, that in light of case law to the contrary, transference of the rule from criminal cases to the civil context is misplaced. At least two Seventh Circuit cases have held that reliance is an element of a civil RICO mail claim predicated on mail fraud. *See, e.g., Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570-71 (7th Cir. 1991) ("Fraud occurs only when a person of ordinary prudence and comprehension would rely on the misrepresentations."), *cert. denied*, 502 U.S. 1099 (1992); *In re EDC, Inc.*, 930 F.2d 1275, 1280 (7th Cir. 1991) (civil RICO case predicated on mail and wire fraud in which court decided without discussing that "there is more to fraud than intent . . [the plaintiffs] can complain only of misrepresentations which were made to them and on which they reasonably relied.").

Even if reliance is not an essential element of a mail fraud claim in the civil context, in order to prove that the Moving Defendants engaged in a pattern of racketeering activity, State Farm must prove reliance to meet the causation element required in RICO claims. RICO provides that "any person injured in his business or property by reason of" a RICO violation may bring a civil action to recover treble damages. *See* 18 U.S.C. § 1964(c). The Seventh Circuit has interpreted that "by reason of" language to require a causal connection

34

between the prohibited conduct and the plaintiff's injury. *See Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 398 (7th Cir. 1984), *aff'd per curiam*, 473 U.S. 606 (1985). In order to establish the required causal connection in the context of an alleged RICO violation based on an act of mail fraud, State Farm must demonstrate that it relied on the alleged misrepresentations. *See, e.g., Krause v. GE Capital Mortgage Servs., Inc.*, No. 97 C 8589, 1998 WL 831896, at *5 (N.D. Ill. Nov. 20, 1998) (citing cases); *Cannon*, 1997 WL 779086, at *7 (citing 2 ARTHUR F. MATHEWS ET AL., CIVIL RICO LITIGATION § 8.04[B][1] (2d ed. 1992)). Therefore, the court concludes that State Farm is required to show reliance on its RICO claims.

### 2.  Common Law Fraud Reliance Requirement

Under Illinois law, in order to prevail on a claim for common law fraud, one essential element a plaintiff must prove by clear and convincing evidence is a justifiable reliance on the fraudulent statements. *See Siegel v. Levy Org. Devel. Co., Inc.*, 153 Ill.2d 534, 542-43, 607 N.E.2d 194, 198 (1992). Therefore, in order to avoid summary judgment, State Farm must set forth enough facts from which a jury could find by clear and convincing evidence that it was justified in relying on the Moving Defendants alleged misrepresentations.

The Seventh Circuit has acknowledged the unclear approach that the Illinois courts have taken toward the issue of when reliance on fraudulent statements is justified. *See AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1041 (7th Cir. 1990); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988). Some degree of a duty of ordinary prudence is imposed on the alleged victim of a fraud -- he or she

must "avoid deliberate or reckless risk-taking." *See AMPAT*, 896 F.2d at 1041- 42. In other words, a plaintiff cannot blindly rely on misrepresentations that suggest an obvious risk, "even if he himself does not perceive the risk." *See id.* at 1042. Therefore, under Illinois law, a plaintiff's exercise of ordinary prudence may include a duty to investigate. *See Angelos*, 839 F.2d at 370. Considering all facts of which the plaintiff had actual knowledge and those facts of which, through the exercise of "ordinary prudence" it may have become aware, a plaintiff is precluded from relying on a misrepresentation "if ample opportunity existed to discover the truth[.]" *See id.* (quoting *Central States Joint Bd. v. Continental Assurance, Co.*, 117 Ill. App. 3d 600, 607, 453 N.E.2d 932, 937 (1st Dist. 1983). In determining whether a party justifiably relied on alleged misrepresentations of another party, the court may take into consideration facts that should put a party on notice, the degree of ability a party has to discover the truth through ease of access to pertinent information; the relative sophistication or business experience of the parties; and whether the party making the alleged misrepresentations created a false sense of security or otherwise prevented further inquiry. *See Angelos*, 839 F.2d at 371; *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1550 (7th Cir. 1990); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 195, 538 N.E.2d 530, 537 (1989).

### 3.   Analysis

The Moving Defendants' reliance argument resembles a laches defense:  specifically, Defendants contend that State Farm cannot show justifiable reliance on the alleged misrepresentations because it knew as early as 1993 that certain claims were not valid, which

therefore put it on notice to investigate. The Moving Defendants also generally argue that given State Farm's size and resources it should have been aware and suspicious of the allegedly invalid claims, and therefore State Farm had a duty to investigate the circumstances of the claim. State Farm's response also focuses on the timeliness of its pursuit of this claim: State Farm alleges in its First Amended Complaint that it "did not discover its injury, and could not have been reasonably expected to do so until late 1995." (First Am. Compl. ¶ 46.) State Farm explains that one of its claims adjusters, Marianne LeDonne, originated the investigation into the accidents involved in this suit in May of 1995. (Pl.'s 12(N), Ex. 56, Dep. of Dennis Schulkins, at 164.)

The Moving Defendants point to two incidents in support of their claim that State Farm was in possession of information which should have put it on notice that the claims were not valid, and therefore triggered its duty to investigate. First, the Moving Defendants point to a December 10, 1993 letter written by one of State Farm's claims superintendents, Bud Sanders, to a law firm for purposes of investigating a particular claim. (Defs.' 12(M), Ex. 105.) In the letter, Mr. Sanders suggests that State Farm is reluctant to settle the case because it was concerned that the claimants had been involved in similar accidents for which they filed claims. (Id., at 1.) Mr. Sanders further indicated that he referred the claim to an outside law firm and reported the claim to the National Insurance Crime Bureau ("NICB"). (Id., at 2.) The Moving Defendants contend that this letter evidences State Farm's knowledge of the alleged "accident ring," and hence its duty to investigate the claim. What the Moving Defendants fail to understand is that in the same breath that they assert that State Farm "just

37

turn[ed] its corporate head from this available information," they also recognized that State Farm undertook an investigation into the suspicious claims. (Defs.' Mot. for Summ. J., at 44.)

To the extent that State Farm did undertake an investigation in 1993, there remains at least a material issue of fact as to when it discovered "the truth" that the claims were fraudulent. In terms of meeting its duty to exercise ordinary prudence, the court believes that the investigation initiated by Mr. Sanders satisfies State Farm's obligation; facts surrounding the circumstances of the accident put him on notice about the suspicious nature of the accident and prompted him to seek outside assistance. Indeed, not only are Illinois insurance companies required to "adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies," *see* 215 ILCS 5/154.6(c), State Farm performs some sort of investigation on each claim filed with the company. (Deposition of Robert Apostolakis, a State Farm adjuster, Defs.' Reply, Ex. C, at 32-36, 44-47, 84-84). The court further concludes that at least some of his efforts were those of a reasonably prudent claims superintendent -- he referred the case to an outside law firm and forwarded the file to the NICB. Whether or not that investigation should have led to State Farm's discovery of the fraudulent nature of the claims at issue here remains a question of fact for the jury. That the fraudulent nature of the claim which alarmed Mr. Sanders could have eluded a claims superintendent, the NICB and an outside law firm engaged to further investigate the claim goes to the heart of State Farm's allegations: that the claims at issue here were manufactured to avoid detection and were staged so as to show clear liability on the part of State Farm's insured. Part of State Farm's investigation requires contacting the claimants, and their

attorneys, and assessing the medical information through the use of specialists. (Apostolakis Dep., at 44-47.) An ordinary prudence standard does not require an insurer to presume that a claimant, an attorney or a medical provider would not be truthful. Why the 1993 investigation did not lead immediately to the filing of this action remains a disputed question of fact.

Second, the Moving Defendants rely on a second incident in arguing that State Farm could not have justifiably relied on the misrepresentations of the attorneys and medical providers in settling the claims at issue here. On November 21, 1995, a State Farm claims adjuster working on a claim filed by Lawrence Carter, one of the SLO Defendants, discovered that Carter had filed five other claims in the previous eleven months. Nevertheless, the adjuster settled the claim by payment to Carter. This information, argue the Moving Defendants, should have put State Farm on notice of the fraudulent scheme, thereby triggering State Farm's duty to investigate. Three of those five other claims involved a small payment for emergency road service, however, and another involved a single car accident caused by a pot hole. Only one of the claims involved a rear end accident with another car. These facts do not reflect that State Farm intentionally ignored an "obvious risk" or "manifest danger," as required to preclude it from alleging fraud. *See AMPAT*, 896 F.2d at 1042. Whether or not State Farm had enough information to actually file its fraud claims until 1996, and was justified in continuing to pay out on facially valid claims, is an issue of fact that ought to be reserved for a jury. That State Farm continued to pay out on claims that are part of this complaint is inapposite; the court has already recognized State Farm's obligation to

pay claims while it investigated whether a fraudulent pattern existed. (Jan. 21, 1999 Status Hearing, Tr. at 27.) Even if State Farm had suspicions about the claims, it could not, consistent with its legal obligations, refuse to pay an individual claim based on suspicions of fraud. The court concludes that whether State Farm was justified in relying on the alleged misrepresentations of the Legal and Medical Defendants is a disputed question of material fact.

### F.    Conspiracy

State Farm also alleges that all the defendants conspired with the Carter Enterprise to defraud insurance companies in violation of RICO and also that each individual legal and medical office of the Moving Defendants participated in common law conspiracy. The Moving Defendants argue that they are entitled to summary judgment on these claims because State Farm has produced no direct evidence of an express agreement, or even evidence that all the alleged co-conspirators knew each other.

### 1.    RICO Conspiracy

A claim for RICO conspiracy under 18 U.S.C. § 1962(d) requires an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, and an agreement that someone would commit at least two predicate acts to accomplish those goals. *See Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999). Although a co-conspirator need not agree to personally be an operator or manager in order to be liable for to conspiracy to commit a substantive RICO offense, "one must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the

enterprise in an illegal manner." *See Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). Mere affiliation with a RICO enterprise is insufficient; a defendant must agree to the commission of the crimes constituting the pattern of racketeering activity. *See American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 543-44 (7th Cir. 1999). "[B]ecause conspiracies are naturally secretive, the law permits conviction upon a showing of 'the essential nature of the plan and. . . [the defendant's] connection with it, without requiring evidence of knowledge of all its details or of the participation of others.'" *See United States v. Flood*, 965 F.2d 505, 509 (7th Cir.) (alteration in original) (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)), *cert. denied*, 506 U.S. 964 (1992).

The Moving Defendants assert that State Farm has produced no evidence of an agreement to participate in the affairs of the Carter Enterprise nor any evidence that there was an agreement to commit any predicate acts. In support of this argument, the Moving Defendants rely on one witness, Marianne LeDonne, a State Farm claims adjuster who originated the investigation leading to this lawsuit, who testified that she was not aware of any "meetings or conversations between any of the defendants to discuss how to defraud the plaintiff or to discuss the operation of this alleged Staged Accident Ring." (Defs. Mot. for Summ. J., at 53-54.) The Moving Defendants then conclude that State Farm has failed to meet its burden of showing that "any medical or legal defendant[] was aware of the essential nature and scope of the Carter Group, the alleged enterprise, or that they intended to participate in it." (*Id.*, at 54.)

This argument is unpersuasive for two reasons. First, State Farm does not have to

show an express agreement. Instead, a conspiracy can be implied from the words, actions and the interdependence of activities and persons involved in the alleged conspiracy. *See United States v. Cea*, 914 F.2d 881, 886 (7th Cir. 1990). Because a conspiracy by nature is secretive, direct evidence is rarely available, and therefore a plaintiff is entitled to prove a conspiracy by circumstantial evidence. *See United States v. Nesbitt*, 852 F.2d 1502, 1510 (7th Cir. 1988). Second, a co-conspirator need not know the identity, role, or degree of involvement of the individuals alleged to be part of the larger conspiracy. *See United States v. Dennis*, 917 F.2d 1031, 1032 (7th Cir. 1990). Therefore, that LeDonne failed to identify any meetings or conversations between the Moving Defendants and the Carter Enterprise is not fatal to State Farm's conspiracy claims.

### 2. Common Law Conspiracy

In Count Four of its First Amended Complaint, State Farm alleges a common law conspiracy by all Defendants to defraud the insurance company. Under Illinois law, "[a] civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *See Bilut v. Northwestern Univ.*, 296 Ill. App. 3d 42, 49 692 N.E.2d 1327, 1332 (1st Dist. 1998). Therefore, to establish a cause of action for conspiracy to defraud, a plaintiff must prove an agreement and a tortious act committed in furtherance of that agreement. *See Burgess v. Abex Corp.*, 311 Ill. App. 3d 900, ___ , 725 N.E.2d 792, 795 (4th Dist. 2000). A civil conspiracy can be proven by circumstantial evidence, but such proof must be clear and convincing. *See McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102,

140-41, 720 N.E.2d 242, 261 (1999). State Farm alleges the same fraudulent conduct in its common law conspiracy count as it does in its RICO count.

### 3. Analysis

Based on the evidence discussed in the sections in this opinion on the substantive RICO violations and the mail fraud violations, the court concludes that State Farm has presented evidence sufficient to raise an issue of material fact about whether the Moving Defendants knew of the scheme, and agreed to facilitate the goals of the scheme through the use of the mails. A fact finder could reasonably infer an agreement to conspire to defraud State Farm from the combination of the payment of referral fees to the SLO Defendants, the directing of uninjured clients to medical providers, and the prescription of unnecessary medical treatment. Whether State Farm will be able to prove their common law fraud allegations by clear and convincing evidence at trial remains to be seen. The court concludes that a genuine issue of material fact exists on the issue of conspiracy to defraud.

### G. Effect of Settlement on the State Law Claims

Finally, the Legal and Medical Defendants assert that Plaintiff cannot maintain its common law fraud claims because State Farm has already been made whole through $3.605 million in settlement payments from Defendants Joseph Dombrowski, David Calimag, M.D., and Calimag S.C. (Defs.'s Mot. for Summ. J., at 56.) According to the Moving Defendants here, State Farm may not maintain an action merely for punitive damages under Illinois law. This argument appears to be premised upon an incorrect reading of the First Amended Complaint. Defendants assert that State Farm has claimed compensatory damages in the

43

amount of only $3 million. Counts I through IV of the First Amended Complaint actually allege that State Farm seeks compensation for actual damages of "more than $3 million." (First Am. Compl. ¶¶ 45, 51, 58, 64.) Including the claims against the Settling Defendants, the First Amended Complaint further alleges twenty counts against different combinations of Defendants, seeking an aggregate total of almost $6.2 million. (First Am. Compl. ¶¶ 72, 80, 88, 96, 104, 112, 120, 128, 136, 144, 152, 160, 168, 176, 184, 192, 200, 208, 216, 224.) Although there may be some overlap in the damages claims against these combinations of Defendants, based on its own calculations from the allegations made in the First Amended Complaint, the court concludes that State Farm has not been made whole for all of its claimed losses through agreements with the Settling Defendants. Further, although it is not clear that as separate enterprises, each combination of Defendants would be jointly and severally liable for the harm caused by the other individual enterprises, neither side has adequately briefed this issue. Therefore, because there is at least some indication that State Farm seeks actual damages in an amount in excess of the total amount for which it has already settled, the court is not inclined to enter judgment in favor of the Legal and Medical Defendants on the state law claims on the asserted basis that State Farm has already been made whole.

## CONCLUSION

For the foregoing reasons, the Legal and Medical Defendants' motions for summary judgment (Doc. 1048-1, 1052-1) are denied. Accordingly, the Defendants' motions to strike portions of State Farm's 12(N) Statement (Docs. 1101-1, 1113-1, 1118-1) are likewise denied.

ENTER:

Dated: May 11, 2000

REBECCA R. PALLMEYER
United States District Judge